M. J. Brown and Bessie I. Brown v. Commissioner.
Brown v. Commissioner
Docket No. 55699.
United States Tax Court
T.C. Memo 1956-141; 1956 Tax Ct. Memo LEXIS 150; 15 T.C.M. (CCH) 709; T.C.M. (RIA) 56141; June 19, 1956
*150 Held, upon the facts, that a net sum received by petitioner upon the purchase of coal mining rights by the holder of an option constituted payment for petitioner's services in negotiating an option and sale for the owner of the property. 2. Held, upon the facts, that loss from loans to a corporation in which petitioner was an officer and stockholder was loss from a nonbusiness bad debt under section 24(k)(4). M. J. Brown, pro se, 216-A South Main Street, Hillsboro, Ill. Joseph C. Crawford, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax for 1948 in the amount of $5,591.02. One of the Commissioner's determinations is not contested, namely, the disallowance of a deduction of $10,000 for an alleged loss. The questions to be decided are as follows: (1) Whether the amount of $19,549.31 received in 1948 by the petitioner, M. J. Brown, in connection with a sale of certain coal rights is taxable as ordinary income as the Commissioner has determined, or is taxable as long-term capital gain, as the petitioners contend. (2) Whether a loss of petitioner, M. J. Brown, in the amount of $16,000, from loans made to Brown Construction Company, which became worthless in 1948, was a bad debt loss incurred in his trade or business and deductible in full under section 23(k)(1), 1939 Code, or was a nonbusiness bad debt within section 23(k)(4), as respondent has determined. Findings of Fact The petitioners, husband and wife, reside in Hillsboro, Illinois. They filed a joint return for 1948 with the collector *152 for the eighth district of Illinois. Gordon Brown is the son of the petitioners. The issues to be decided relate only to the petitioner, M. J. Brown. Therefore, he is referred to hereinafter as the petitioner. Petitioner is a member of the bar of Illinois and has practiced law since 1910 in Hillsboro, Illinois. Issue 1: Harry Hargrave carried on a practice of purchasing coal rights in Illinois as early as 1911. He employed a law firm in Hillsboro to examine abstracts of title to coal lands and coal rights in connection with his activities. Petitioner, in 1911, worked for that law firm and became acquainted with Hargrave. Between 1911 and 1926, Hargrave acquired 100,000 acres of coal lands. In 1926, he moved to California. Before he went to California he had disposed of all of his interests in coal lands with the exception of about 4,800 acres located in Christian County and Shelby County, Illinois. The law firm with which petitioner was associated handled most of the transactions involving sales of coal lands in which Hargrave had interests. At the time Hargrave was preparing to move to California, he asked petitioner to help him dispose of his remaining interest in coal lands *153 in Illinois and after 1926 petitioner, individually, represented Hargrave. At some time before 1943 or 1945, Hargrave conveyed his remaining interest in Illinois coal lands to his daughter, Mary McHaffie, who lived in California. The coal business was depressed between 1926 and 1943. In about 1943 conditions in the coal business improved and petitioner so advised Hargrave who was still in California. In May or June of 1944, petitioner sent Hargrave an undated option form to be signed by Mary McHaffie giving petitioner, his heirs and assigns, an option to purchase her coal rights. On about July 1, 1944, the option (exhibit 2) to purchase coal rights to approximately 4,800 acres of coal lands was signed by Mary McHaffie and returned to petitioner. However, the option remained undated. The option provided that for a consideration of $1, petitioner could purchase Mary McHaffie's interest in the coal lands for $10 an acre within six months, and that failure to give notice of intention to purchase within the time specified would terminate the option. The option provided as follows: "For and in consideration of One Dollar (1.00) to me in hand paid, the receipt where of is hereby acknowledged, *154 I hereby grant to M. J. Brown, his heirs and assigns an option for six months from date hereof, to purchase at $10.00 per acre the coal and mining rights with the right to mine and remove the same under the following described lands: * * * situated in Christian County, Illinois; also * * * situated in Shelby County, Illinois, and containing in all Four-Thousand-Three-Hundred-Seventy-Seven (4377) acres, more or less, and except however, the right of way of the Illinois Central Railroad Company extending * * * through said Sections 33, 4, 8 and 9, upon the following terms, and conditions, to wit: The said M. J. Brown, his heirs and assigns to signify his or their intention to purchase the same by due notice in writing within the time above specified, and to be properly mailed, stamped and addressed to the undersigned, by special delivery mail, and a failure to serve such notice, time being of the essence of this agreement. In case said notice shall be served in due time, then an additional sixty days shall be given for the examination of abstracts, making deeds and closing the sale. "The undersigned agrees to furnish abstracts of title to the said coal lands showing a good, merchantible *155 title to the same, in the undersigned. In the event additional time is required to relieve the said lands from tax liens, the undersigned shall have such further time as may be necessary for relieving the said lands from tax liens, and tax assessments. "The description of the coal lands intended to be conveyed and hereinabove set forth is believed to be substantially correct, but is hereby declared to be the intention of the party hereto that the coal lands actually owned by the undersigned forming the block above described are the lands intended to be covered by this option and to be conveyed to the said M. J. Brown, his heirs and assigns, in the event the said option is accepted in accordance with the terms hereinbefore set forth. "/s/ Mary H. McHaffie (Mrs.) Owner" The six months' option was given because the contracting parties did not contemplate that petitioner would buy the coal rights for himself. The option recites a consideration but none was ever given by the petitioner to Mary McHaffie for the option. Petitioner was given the option to purchase the coal rights in order that he might arrange a quick sale if purchasers could be found. On February 10, 1947, petitioner *156 wrote a letter to Hargrave (exhibit 11) in which he reported that he had been negotiating with Peabody Coal Company, Chicago, Illinois, (hereinafter called Peabody) about the coal lands in the name of Mary McHaffie (hereinafter called Mary), and that Peabody had finally asked for an option. Petitioner stated that he had prepared "an option and contract," which he enclosed with the letter, the option and contract "to be considered together." Reference is made hereinafter to this option and contract. Petitioner advised Hargrave, further, that he had "priced" the Hargrave coal mining rights to Peabody at $15, and never less, and he advised, further, as follows: "* * * My friend in Chicago told me that there would have to be a difference between the sum you get and the price to be recited in the deed and option. He advised me that this is the way they would eventually deal and it seems as though he knew what he was talking about. In pricing it at that figure [$15 per acre] I told him that you would have to have $10.00 an acre and that the taxes would have to be paid by some one other than you and that the cost of the abstract and other expenses would have to be borne by some one other *157 than you; in other words, you are to get $10.00 an acre net. The price has been worked out with that understanding and that also means that I am to get my pay for my services out of the $4 per acre, and that you will therefore get $10.00 per acre absolutely net." During the course of petitioner's conversations with Peabody, it had made test borings, or holes, in the Hargrave coal lands, also known as the Pana coal property, which constituted satisfactory tests of the coal deposits under the surface. Thereafter, Peabody was interested in obtaining an option. The draft of an option from Mary to Peabody, referred to and enclosed in petitioner's letter of February 10, 1947, contained the same description of the Pana coal property as was set forth in the undated option of Mary to petitioner above set forth; it gave Peabody an option to purchase at $15 per acre; it gave Peabody 90 days within which to exercise the option; written notices of the election to be given to Mary, to Hargrave, and to petitioner; Mary agreed to furnish abstracts of title, pay all tax liens, and convey the coal lands to Peabody free of all liens and encumbrances. This option, exhibit 3, to Peabody did not refer *158 to any previous or prior option to petitioner. Mary executed the option to Peabody on February 14, 1947, and returned it to petitioner to deliver to Peabody. As of February 14, 1947, petitioner had not at any time given Mary notice of election to exercise the undated option to him which she had executed on about July 1, 1944. Petitioner sent the option agreement to Peabody but Peabody discovered errors in the descriptions of the boundaries of the coal lands and pointed out that they covered about 4,800 acres rather than about 4,400 acres as specified in the option. Peabody requested a corrected draft of the option. Petitioner prepared a corrected draft, exhibit 4, which was in all other respects the same as the draft executed by Mary on February 14, 1947. Mary received the new draft of the option. She executed it on February 22, 1947, and returned it to petitioner who forwarded it to Peabody. Exhibit 4 is incorporated herein by this reference. As of February 22, 1947, petitioner had not given Mary any notice of election to exercise the undated option to him executed by Mary on about July 1, 1947. In his letter of February 10, 1947, to Hargrave, petitioner stated that he was enclosing *159 a "contract" (referred to above) which was to be considered together with the option to Peabody. This contract, entitled "Agreement," was executed by Mary under the date, February 22, 1947, the same date as the corrected option to Peabody was executed. Petitioner also executed this agreement. The contract is as follows: "AGREEMENT "THIS AGREEMENT, Made and entered into on the 22nd day of February, 1947, by and between Mary McHafey and M. J. Brown, WITNESSETH: "WHEREAS, the said Mary McHafey has herefore granted certain options to M. J. Brown authorizing him to purchase or make sale of approximately forty-eight hundred acres of coal lands owned by Mary McHafey and located in a block south of Pana in Christian and Shelby Counties, Illinois; and "WHEREAS, the said M. J. Brown has recently succeeded in getting the Peabody Coal Company of Chicago, Illinois, to request that it be given an option to purchase said coal lands for $15 per acre, which is in excess of the sum which the said Mary McHafey was to receive under the prior options granted to M. J. Brown; and "WHEREAS, the said Mary McHafey has this day executed an option to said Peabody Coal Company authorizing it to purchase *160 said coal lands at said price within ninety days and is delivering the same to the said M. J. Brown to be delivered to Peabody Coal Company; and "WHEREAS, the said Mary McHafey is willing to accept the net sum of $10.00 per acre for said coal lands; and "WHEREAS, there are large sums due for unpaid taxes on said coal lands, and the abstracts of title to said coal lands have not been brought down to date since they were made about thirty years ago, and abstracts of title are demanded by Peabody Coal Company showing title to date of purchase; and "WHEREAS, there will be other items of considerable expense in making sale of said coal lands to the Peabody Coal Company; and "WHEREAS, the said Mary McHafey, in order to get said sale made is willing to pay and assign the sum received from such sale to the said M. J. Brown, that is, $5.00 per acre for the coal lands so sold, provided however, that the said M. J. Brown will pay all the taxes due on said coal lands at the time of said sale, and pay the costs of bringing the abstract of title down to date to the date of sale, and pay all other expenses incurred in making said sale, including revenue stamps to be placed on the deeds of *161 conveyance, and to pay all commissions, fees and charges to any and all persons incurred in making the sale of said coal lands; and "WHEREAS, the said M. J. Brown in consideration of the assignment and payment to him out of the proceeds of the sale to be paid by the Peabody Coal Company to the said Mary McHafey, is willing to pay all the taxes due on said lands at the date of said sale, and to bring the abstracts of title down to said date, to pay for revenue stamps to be placed on the deed of conveyance, and to pay all commissions, fees and charges of every kind and character required in making a sale of said coal lands to Peabody Coal Company under the option above referred to. "NOW THEREFORE, the said Mary McHafey hereby assigns and agrees to pay to M. J. Brown, out of the moneys received from the sale of said coal lands to the Peabody Coal Company, the sum of $5.000 per acre for each acre sold; and in consideration thereof, the said M. J. Brown agrees to pay out of the money so received by him all taxes and penalties due thereon said coal lands at the time such sale is made; and the said M. J. Brown further agrees to pay the costs of clearing the title and bringing the abstracts *162 of title to said lands down to date and cause the same to be made acceptable to the Peabody Coal Company; and the said M. J. Brown further agrees to pay the costs of revenue stamps, and all other costs and charges and attorney fees necessary or required for perfecting said title and in making said sale, and to pay all fees and commissions to all other persons who have participated in the making of such sale; and the said M. J. Brown further agrees that the said Mary McHafey will not be required to pay any fees or commissions to any other person for services performed in the making of said sale. "/s/ Mary McHafey /s/ M. J. Brown" Peabody requested and received a short extension to June 1, 1947, within which to give notice of its desire to exercise the option to purchase the coal and other mining rights in the Pana coal lands. Petitioner advised Peabody by letter dated May 17, 1947, that Hargrave had given orally by long-distance telephone consent to extending the option period to June 1, 1947. Peabody exercised the option granted it by Mary on February 22, 1947. At some time in December 1947, Peabody was ready to proceed with the purchase of the coal and other mining rights and *163 a deed was prepared for Mary's signature. On December 20, 1947, Mary executed (exhibit 13) the following instrument (sometimes referred to in the record as a "power of attorney") which was addressed to Peabody and to Hershey & Bliss, attorneys: "I have delivered to the bearer, M. J. Brown, along with this instrument, a deed to the coal lands I own in Christian and Shelby Counties, Illinois, which are the coal lands I optioned to you on the 22nd day of February, 1947. "1. The said M. J. Brown is hereby authorized to deliver said coal deed to you. "2. A bank draft or certified check on any national bank in the sum of $48,959.10 is to be made payable to me at the time said deed is delivered and the same is to be immediately mailed to me by said bank at 447 N. Almansor, Alhambra, Calif.
"3. The balance of said sale price in the sum of $24,479.55 shall at the same time be paid to M. J. Brown. "(a) The said M. J. Brown, out of the the sum of $24,479.55 shall at the same now due and owing on said coal lands and the said Hershey & Bliss shall by letter at said time advise me that said taxes have been paid. "(b) The said M. J. Brown shall at the same time pay the cost of bringing *164 all the abstracts to said coal lands down to date, and he shall as soon as possible thereafter, furnish me with receipts showing payment of their bills in full for the making of said abstracts. "(c) The said M. J. Brown out of the sum received by him shall purchase, affix and cancel the necessary revenue stamps required on said coal deed. "4. I further authorize the said M. J. Brown and Charles Bliss to do and perform any and all acts which are necessary to carry out the purposes mentioned in paragraphs 1, 2 and 3. Dated this 20th day of December A.D. 1947." It was ascertained that the acreage covered by the Pana coal lands amounted to 4,871.48 acres. The price paid by Peabody, at the rate of $15 per acre was therefore $73,072.20. Mary executed a deed to Peabody of the mineral and mining rights dated January 8, 1948, and the deed was delivered to Peabody. There was some error in the deed referred to in the document dated December 20, 1947 which occasioned executing another deed dated January 8, 1948, and also, a correction was made in the amounts of the two checks to be given by Peabody, described in paragraphs 2 and 3 of the document dated December 20, 1947. Peabody made *165 payment of the purchase price of $73,072.20 by two checks. One check was made payable to Mary in the amount of $48,714.80; it was delivered to petitioner; he mailed it to Mary under letter dated January 9, 1948. The second check was in the amount of $24,357.40, and it was given to petitioner. Out of the sum of $24,357.40, petitioner expended $4,808.09 for back taxes, tax liens, abstracts of title, revenue stamps for the deed, and other costs of making the sale, so that he retained the net amount of $19,549.31. Petitioner did not at any time give Mary any notice of election to exercise the undated option to purchase the mining and mineral rights for $10 per acre, which Mary executed on about July 1, 1944. He did not at any time assign any option of his to Peabody. Mary sold the mineral and mining rights to Peabody for $15 per acre, or $73,072.20, as a result of Peabody's exercise of the option granted by Mary to Peabody on February 22, 1947. Petitioner received, out of the total price paid by Peabody, $24,357.40, under the agreement, or contract, of February 22, 1947 (set forth above), between Mary and petitioner, whereby Mary agreed with petitioner that she would be willing to *166 receive $10 per acre for the coal lands, and whereby she assigned to and agreed to pay to petitioner, "in order to get paid sale made", a sum equal to $5 per acre, provided that petitioner would pay taxes, costs, fees, commissions, and all the other expenses of the sale; and whereby petitioner agreed to make all such payments in consideration of Mary's assignment and payment to him of a sum, out of the entire proceeds of the sale to Peabody, equal to $5 per acre. Petitioner has a real estate broker's license which he has had for 15 or 20 years. He occasionally sold a tract of real estate. The net proceeds received by petitioner, $19,549.31, out of the proceeds of the sale to Peabody constituted compensation for petitioner's efforts in bringing about the purchase of the mineral and mining rights by Peabody from Mary. Issue 2: The Brown Construction Company (hereinafter called the corporation) was organized by petitioner in 1946 under the laws of Illinois for the purpose of building and selling GI homes in Hillsboro, Illinois. Approximately ten thousand dollars was invested in the capital stock of the corporation. One-half of the stock was issued to petitioner, and the remaining *167 50 per cent of the stock was issued to petitioner's wife, and to their son, Gordon Brown. Petitioner was appointed president of the corporation; Bessie I. Brown was appointed treasurer; and Gordon Brown was appointed secretary. The corporation constructed 10 houses. As the work progressed, petitioner advenced, from time to time, funds to defray the costs of material and labor. He advanced at least $16,000 to the corporation. The corporation made sales of 9 houses in 1947 and 1948. None was sold in 1949, and one remained unsold. Purchasers financed their purchases through FHA loans and mortgages. The corporation sold houses at a loss, and as of July 1, 1948, the corporation's accountants determined that the corporation was insolvent. The corporation has not repaid petitioner any part of the $16,000 which he advanced to the corporation. Opinion HARRON, Judge: Issue 1: The issue is whether the net sum of $19,549.41 which petitioner received in 1948 is ordinary income under section 22(a) or capital gain from the sale or exchange of a capital asset under section 117, 1939 Code. The Commissioner has determined that it is ordinary income; therefore, it is taxable in full. Petitioner *168 presents a novel, an elaborate, and a complicated argument, and he cites many rules of law. All have been considered. A great deal of the law which petitioner cites is irrelevant to the facts and to the issue. Petitioner advances the theory that the undated option granted him on July 1, 1944, by Mary was a continuing option which was left undated so that the 6 months' option period stated therein would not begin until such time as petitioner found a person who was willing to take an option to buy the Pana coal property coal rights; that the option which Peabody exercised on about June 1, 1947, was not the option Mary granted Peabody on February 22, 1947, but was petitioner's option which Mary had executed on July 1, 1944, which petitioner alleges he sold and assigned to Peabody in consideration for $5 per acre. It follows, petitioner argues, that since he had held the option more than 6 months at the time he allegedly assigned it to Peabody, and since $24,357.40 constituted payment by Peabody to him for the alleged assignment of his option to Peabody, the net gain to him is long-term capital gain. Petitioner is the only person who gave testimony in this proceeding. That is to say, *169 there is no testimony or evidence apart from the various exhibits, to corroborate petitioner's theory. There is no evidence that Mary McHaffie did not intend to grant an option to Peabody, or that she regarded the alleged "option" of July 1, 1944, to petitioner as a true option in existence in February 1947. Furthermore, there is no evidence whatsoever that petitioner made an assignment of his alleged "option" to Peabody. Cf. . The evidence shows that Peabody requested an option agreement from Mary having accurate descriptions of the properties, and that Mary executed a new option agreement, which was executed by Peabody, the terms of which differed materially from petitioner's alleged "option." We are of the opinion that the instrument executed by Mary on July 1, 1944, was not a true option to petitioner but was more in the nature of a unilateral offer, and that giving the instrument to petitioner was a method adopted for offering the continuing property rights for sale. The instrument was undated and it did not contain the date of execution by Mary. The date, July 1, 1944, is supplied by petitioner's testimony *170 and by general circumstances. Option contracts have been defined repeatedly as follows: "An option contract is one by which the owner of property agrees with another person that the latter shall have the right to buy the former's property at a fixed price within a certain time." . Petitioner's socalled "option" does not specify a time for performance by the optionee, there having been no date fixing the 6 months' period stated in the instrument, and no consideration was given for it. Also, there was a contract executed by and between Mary and petitioner on February 22, 1947, the terms of which are clear and unambiguous. But if there is any doubt about that, then it is observed that in his letter of February 10, 1947, in which the draft of the above contract between himself and Mary was inclosed, petitioner stated that he was to receive his pay for his services out of the $4 per acre, $10, net, to be received by Mary. It is concluded that Mary assigned to petitioner in advance, out of the total consideration to be paid by Peabody under its option from Mary, $24,357.40 for the payment of taxes, costs, expenses, *171 and for petitioner's services in locating a purchaser of the coal rights. It follows that the net amount received by petitioner was not long-term capital gain from the sale or exchange of a capital asset, but was ordinary income. In his return for 1948, petitioner did not treat the net sum which he received, $19,549.31, as long-term capital gain. Apparently after he filed his return he made this claim because in the statutory notice, it is denied by the Commissioner. Of course, petitioner is entitled to raise the issue here. Petitioner has failed to bring himself squarely within the terms of section 117. See . For the reasons set forth above, we overrule petitioner's contention. Issue 2: The question raised by the pleadings is whether loans to the Brown Construction Company in the amount of $16,000, which respondent concedes became worthless in 1948, constitute business bad debts, loss from which is deductible in full under section 23(k)(1), 1939 Code. Respondent contends that the loans were nonbusiness bad debts, loss from which is deductible to the limited extent provided by section 23(k)(4). Petitioner has not presented *172 any argument on brief under this issue and it is presumed, therefore, that he has abandoned the issue. But petitioner could not succeed under this issue. His serving as an officer of the corporation and being a creditor as well as a stockholder did not constitute a business. The loss he sustained was not a loss from a business bad debt, rather, it was a loss from a nonbusiness debt within section 23(k)(4). . Decision will be entered for the respondent.